Filed 3/15/24  P. v. Orozco CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| THE PEOPLE, | C096465 |
| Plaintiff and Respondent, | (Super. Ct. No. P20CRF0480) |
| v. | |
| JUAN CARLOS VASQUEZ-OROZCO, | |
| Defendant and Appellant. | |

In a prosecution stemming from an early-morning shootout with law enforcement in which one officer was killed and another wounded, a jury found defendant Juan Carlos Vasquez-Orozco guilty of second-degree murder (Pen. Code, § 187, subd. (a), count 1)[1] and two counts of assault with a firearm (§ 245, subd. (a)(2), counts 2 and 3).  The jury also found true allegations that defendant personally used and discharged a firearm causing death in the commission of count 1 (§ 12022.53, subds. (b)-(d)) and that he

---

[1]    Undesignated section references are to the Penal Code.

1

personally inflicted great bodily injury in the commission of count 2 (§ 12022.7, subd. (a).) The trial court sentenced defendant to an aggregate term of 15 years to life plus six years in state prison. The court struck the section 12022.53 enhancements under section 1385, subdivision (c).

On appeal, defendant argues the trial court prejudicially erred by instructing the jury with CALCRIM Nos. 571, 3471, and 3472 because (1) the evidence was insufficient to support giving CALCRIM No. 3471, and (2) CALCRIM Nos. 571 and 3472 were incomplete and misstated the law under the facts of this case. He further contends that the instructional errors unconstitutionally deprived him of his right of self-defense. Alternatively, he claims his counsel rendered ineffective assistance by failing to object to the instructions.

We find no error affecting the convictions. However, we have identified a sentencing error that resulted in an unauthorized sentence. We therefore remand for resentencing, but otherwise affirm the judgment.

BACKGROUND FACTS

A. *Prosecution's Case*

1. *The Incident*

On October 23, 2019, at about 12:25 a.m., El Dorado County Sheriff's Deputies Brian Shelton, Brian Ishmael, and Shawn Taroli (and his ride-along, San Joaquin County Sheriff Deputy Josh Tasabia) were dispatched to 4740 Sandridge Road in El Dorado County. The owner of the property, Christopher Ross, had reported seeing flashlights in his yard and believed people were trying to steal his marijuana plants.

Ross's heavily wooded, nine-acre rural property had a long gravel driveway that led to a house and some outbuildings. A path behind the house led to an above-ground pool dug into the hillside. Up a steep incline from the pool was a clearing, which contained approximately 100 marijuana plants. Further up the hillside, near the top of the ridge, was a tent, partially obscured by bushes and a fallen tree branch.

2

When the deputies arrived at the property, they initially converged at the bottom of the hill behind the house. Ross pointed out the path leading up the hill to the marijuana grow. Ross did not inform the deputies that two people—defendant and Ramiro Morales—were living in a tent on his property, having been hired to tend and protect the marijuana plants.

It was pitch black and visibility was poor as the deputies slowly proceeded up the hill, sparingly using their flashlights. As the deputies approached the top of the hill, Deputy Taroli saw the tent and illuminated it with his flashlight. As he did so, he noticed a Hispanic male attempting to hide behind some shrubs. Deputy Taroli loudly announced, "Sheriff's Office. Show me your hands. Put them up." Deputy Shelton simultaneously shined his flashlight and yelled, "Show me your hands."[2] The man turned and ran. Deputy Taroli told the other deputies to let him go.

Shortly thereafter, Deputy Tasabia saw the same suspect—subsequently identified as defendant—emerge from behind a berm in a shooting stance, pointing a semiautomatic handgun in the direction of him and Deputy Ishmael. Defendant yelled something and then fired his gun. While the other deputies retreated and took cover, Deputy Ishmael returned fire.

Deputies Tasabia and Ishmael started to retreat, sliding backwards on their stomachs down the hill while keeping their weapons ready. As they were doing so, they saw defendant point his gun at them and fire several shots. Almost simultaneously, Tasabia and Ismael fired multiple rounds back at defendant. During the gunfire exchange, Tasabia was shot in the left hip and Ishmael was shot in the chest, just below the esophagus.

---

[2]    Both Deputies Taroli and Shelton were wearing microphones that recorded audio on the night of the incident. Portions of those audio recordings, including the parts in which they identified themselves as deputy sheriffs, were played for the jury.

Deputy Tasabia grabbed Deputy Ishmael and began helping him down the hill. At one point, Tasabia saw defendant and fired two more rounds in his direction. From the pool area, Deputy Taroli and Deputy Shelton also fired shots at defendant.

Eventually, Deputy Tasabia and the other deputies transported Deputy Ishmael down the hill. Deputy Ishmael was taken to the hospital, where he was pronounced dead, having suffered a gunshot wound to his right foot and a fatal shot to his upper chest.

California Highway Patrol air units arrived and located the two suspects using an infrared sensor. When defendant was taken into custody, he had no weapons, but he had a bullet wound in his right hip and a nine-millimeter cartridge in his front pant pocket.

2.    *Morales's Testimony*

Morales's federal plea agreement required him to testify truthfully at defendant's trial in exchange for a reduced sentence.

Morales testified that he was hired to help harvest marijuana plants on Ross's property. Morales was expected to live on the property and protect the plants at night. Morales was given a pistol and instructed to fire a warning shot in the event of a theft or robbery; he relayed this information to defendant.

On October 23, 2019, between midnight and 1:00 a.m., defendant was sleeping in the tent and Morales was on guard duty. Morales's cousin called and told him to "get ready" because there had just been a robbery. A short time later, Morales saw lights outside the tent. Morales woke defendant, told him they were being robbed, and handed him the gun. Defendant took the gun and told Morales to run. Morales heard the words "one more," in English, and then a gunshot. Morales ran and hid. One or two minutes later, he heard more gunfire. He did not know how many shots were fired. Eventually, defendant called and said he was wounded and directed Morales on how to find him. When Morales arrived, defendant told him there were five people there and that he had used the gun to defend himself. Morales helped defendant down the hill until he saw the police, at which point he dropped defendant, hid the gun, and surrendered.

4

### 3. *Forensic Evidence*

Near the area where defendant and Morales surrendered to SWAT officers, investigators found a Smith and Wesson nine-millimeter handgun and forty-six rounds of ammunition. Biological evidence found on the Smith and Wesson and the ammunition matched defendant's DNA.

### 4. *Defendant's Statements to Law Enforcement*

Defendant was interviewed twice by law enforcement officers while he was in the hospital. Defendant told investigators that, on the night of the incident, Morales woke him and said people were there to rob them. Defendant initially denied having a gun, but eventually admitted that he had a nine-millimeter pistol. Defendant said he took the gun, walked out of the tent, and saw five or six men coming up the hill. Although it was very dark, defendant said he could see that they were carrying rifles. He said he could hear the men speaking but did not understand what they were saying. Defendant did not think the men were police.

At first, defendant denied firing his gun, but eventually admitted that he fired one or two warning shots into the ground, to the side of the men, to scare them off. When the men started shooting at him, he started running and shooting back, firing multiple rounds.[3] During a calm period that lasted about two to three minutes, defendant reloaded. When defendant stood up, the shooting resumed, and defendant was shot. Defendant returned fire as he was running away. When the shooting stopped, defendant called Morales and asked for help.

---

[3] Defendant initially claimed that he fired only two shots before admitting that he fired multiple rounds.

B.    *Defense Case*

1.    *Defendant's Testimony*

Defendant testified on his own behalf, using an interpreter since he does not speak English.  Defendant testified that he was hired to live and work on the property, tending to and protecting the marijuana plants.  He was given a gun and instructed to use it to scare away intruders.  Defendant was told that there had been a robbery nearby and that the robbers had shot someone.  About a week before the incident, defendant encountered two people on the property in the early morning.  Defendant fired two shots to the side of the intruders, who ran away.

On October 21, 2019, Morales arrived at the property and defendant told him about the incident the previous week.  Morales shared that he had been robbed while working at a marijuana grow in Oroville.  Defendant and Morales agreed to take turns sleeping while the other was on guard duty.

On the night of the incident (October 23), defendant was sleeping while Morales stood guard.  Morales woke defendant and told him that he had been advised to be on alert because another grower had just been robbed.[4]  Defendant went back to sleep, telling Morales to awaken him if something happened.

Later, Morales woke defendant and told him the robbers were at the property. Defendant took the gun and exited the tent.  It was dark, but defendant saw some lights about 10 to 15 meters below the tent.  Defendant could not hear anything but could see shadows of people.  He denied seeing any rifles.

Defendant walked to the right of the tent and fired two warning shots into the ground, briefly pausing between shots.  Defendant testified that he was only trying to

---

[4]    The parties stipulated that at 12:14 a.m. on October 23, 2019, there was a 911 call regarding a robbery, and El Dorado County Sheriff's deputies were dispatched to a nearby property.

scare the people. Before shooting, defendant did not hear any of the people identify themselves as police officers. He believed they were the same intruders who had been there the week before.

After the second warning shot, the people started shooting at him. Defendant was afraid and believed the people were trying to kill him, so he shot back.

After the shooting stopped, defendant waited several minutes before looking to see if the people were gone. As he looked around, he heard a shot and realized he had been grazed by a bullet. He started running, firing his gun as he ran. As he was running, defendant was hit by another bullet and fell to the ground.

Defendant called Morales for help, who helped defendant head towards the road by carrying him. They surrendered a few minutes after seeing a police vehicle. Defendant later learned that the people he shot at were police officers and that he had killed an officer. Defendant claimed that he never intended to injure anyone.

2.    *Defense Experts*

Rahn Minagawa, an expert in forensic and clinical psychology, testified on human physiological or biological reactions to unknown and/or potentially life-threatening situations. Based on a hypothetical reflecting the facts of the case, Minagawa opined it would be objectively reasonable for a 20-year-old male like defendant to believe his life was in imminent danger when the "intruders" were shooting at him.

Robert C. Maher, an expert in forensic audio analysis and audio engineering, reviewed law enforcement audio recordings from the incident. Based on that review, he opined there were four different episodes of gunshots. "Episode 1" consisted of a single gunshot. "Episode 2" included approximately nine shots and began about 25 seconds after Episode 1. "Episode 3" included two shots and occurred about 35 seconds after Episode 2. "Episode 4" involved multiple, overlapping gunshots, and occurred after a four-to-five-minute gap.

7

Chris Coleman, an expert in crime scene reconstruction, shooting reconstruction, crime scene processing, firearms and ammunition, and force options, went to the scene on October 13, 2020, around midnight. He chose that date because the conditions were like the night of the incident. Coleman testified that it was very dark and difficult to see, and that the terrain was steep and dangerous. Coleman opined, based on his review of the evidence, that the location of shell casings was consistent with a person standing in front of the tent and firing to the right, and then running away along the path.

DISCUSSION

I

*Self-Defense Instructions*

Defendant contends the trial court prejudicially erred when it instructed the jury on limitations to the right of self-defense under CALCRIM Nos. 571, 3471, and 3472. We disagree.

A. *Additional Background*

The trial court provided the jury with multiple instructions on self-defense. Regarding perfect self-defense, the trial court instructed the jury using CALCRIM No. 505, the standard instruction for justifiable homicide.[5] The jury was told that "[t]he defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another." The jury was told that a defendant acts in lawful self-defense if he reasonably believed that he or someone else was in imminent danger of being killed, suffering great bodily injury, or being robbed; reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and used no more force than was necessary to defend against that danger. The jury also was told that "[t]he defendant's belief that he or someone else was threatened may be reasonable even

_____

[5]    The trial court also instructed the jury with CALCRIM No. 3470, describing self-defense in non-homicide crimes.

8

if he relied on information that was not true. However, the defendant must actually and reasonably have believed that information was true." In addition, the jury was told that "[a] defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury or robbery has passed."

Regarding imperfect self-defense, the trial court instructed the jury in the language of CALCRIM No. 571 that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury. The court further informed jurors, using the optional bracketed language of the standard form instruction, that: "Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances justifying his adversary's use of force."

The trial court told jurors that the People have the burden of proving beyond a reasonable doubt that the defendant was not acting in perfect or imperfect self-defense.

As relevant here, the trial court also instructed the jury with CALCRIM Nos. 3471 and 3472. CALCRIM No. 3471 is the standard instruction on the right to self-defense in a mutual combat or initial aggressor scenario. The court instructed the jury that: "A person who engages in mutual combat or starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; and, [¶] 2. He indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and, [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop

9

fighting." The court did not include the following bracketed language defining mutual combat: "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

CALCRIM No. 3472 is the standard instruction on contrived self-defense. The trial court's instruction told the jury: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."[6]

The record does not reflect any objections from defense counsel to any of these instructions.

During closing argument, the prosecutor structured a significant portion of his argument around defendant's claim of self-defense. The prosecutor argued that defendant did not act in self-defense because defendant did not actually or reasonably believe that he (or Morales) were in *imminent* danger of being killed or suffering great bodily injury. The prosecutor also argued that defendant did not have a right to self-defense because the evidence showed (1) defendant was the initial aggressor who shot first (CALCRIM No. 3471), (2) defendant provoked a fight with the intent to create an excuse to use force (CALCRIM No. 3472), and/or (3) defendant's wrongful conduct created the circumstances that justified the adversary's use of force (CALCRIM No. 571).

---

[6] After defendant's trial, CALCRIM No. 3472 was revised to include additional bracketed language to be given "if there is evidence that the defendant intended to provoke only a non-deadly confrontation and the victim responded with deadly force." (Judicial Council of Cal., Crim. Jury Instns. (2022 ed.) Bench Notes to CALCRIM No. 3472, p. 115.) This new bracketed language states: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting." (CALCRIM No. 3472.)

The prosecutor noted that there is a "sudden escalation exception" if the defendant, as the initial aggressor, used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight. However, the prosecutor argued the exception did not apply because defendant's initial act of firing a gun constituted the use of deadly force.

Defense counsel argued that defendant did not intend to kill anyone. Rather, defense counsel argued, defendant was "a 20-year-old inexperienced boy who [w]as met with intruders while he was sleeping in his tent. He tried to scare [the intruders] off by shooting to the ground and was met with a flurry of rifle fire." Defendant then returned fire in (perfect or imperfect) self-defense. Defense counsel referred to the incident as a "horrible tragedy" that was set in motion by Ross.

During deliberations, the jury asked for a definition of imminent danger and whether shooting a gun at the ground is considered deadly force. The trial court referred the jury to CALCRIM No. 571 for the definition of imminent danger. The trial court answered the deadly force question as follows: "Please refer to [CALCRIM No. 200], paragraph 6 regarding definitions. [¶] Deadly force does not have a specific legal definition. Therefore, you are to apply this term using its ordinary, everyday meaning. [¶] As the trier of facts, it is up to you and you alone to determine based on the evidence presented to you whether the act to which you are referring 'shooting a gun at the ground' is considered deadly force."

B.      *Standard of Review*

The trial court is obligated to instruct the jury on all "general principles of law that are ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." [Citation.]' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) At the same time, it is in error to give an instruction which, while correctly stating a principle of law, is not supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

11

When a trial court chooses to instruct on a legal point, it must do so correctly. (*People v. Townsel* (2016) 63 Cal.4th 25, 58.) Generally, however, a court has no sua sponte duty to revise or improve upon an accurate statement of law, and a party may not complain on appeal that an otherwise correct instruction was too general or incomplete unless the party made an appropriate objection. (*People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

We review a claim of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) In assessing a claim of instructional error, we look to the instructions as a whole and the entire record of the trial, including the arguments of counsel, and we assume that jurors are intelligent persons capable of understanding and correlating all instructions given. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) In reviewing a purportedly ambiguous or misleading instruction, we inquire whether there is a reasonable likelihood the jury applied it in an impermissible manner. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) Instructions should be interpreted to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*Lopez, supra*, at p. 708.)

C.    *CALCRIM No. 3471*

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 3471 because there was insufficient evidence that he was the initial aggressor or engaged in mutual combat. Defendant contends the error was prejudicial because it allowed the jury to rely on an improper theory to reject his claim of self-defense.

As a preliminary matter, we agree with the People that defendant technically forfeited this issue because there is nothing in the record to suggest his trial counsel objected to the challenged instruction. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 498.) Nevertheless, we exercise our discretion under section 1259 to reach the merits because the error arguably affected defendant's substantial rights. (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.)

12

Focusing on the evidence favorable to his position, defendant contends there was no substantial evidence to support the initial aggressor instruction. Although defendant fired his gun first, he did so only as a "warning," to scare off the intruders who he believed were there to rob him. Defendant contends this evidence was insufficient to support the initial aggressor instruction. We disagree.

When deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether it is sufficient to deserve consideration by the jury. (*People v. Benavides* (2005) 35 Cal.4th 69, 102; *People v. Salas* (2006) 37 Cal.4th 967, 982.) Evidence is sufficient to deserve consideration if a reasonable jury could find it persuasive and therefore conclude that the particular facts underlying the instruction exist. (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; *People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Thus, in reviewing for substantial evidence, we view the evidence in a light most favorable to the instruction.

Here, defendant cites the evidence favorable to his position, but disregards the unfavorable evidence. Such evidence includes the testimony of Deputies Tasabia and Taroli that defendant initiated the shooting, not by firing warning shots into the ground, but by pointing his gun and firing in the direction of Tasabia and Ishmael, who were less than 20 feet away. Deputy Tasabia also testified that after he and Deputy Ishmael started to retreat, defendant initiated the second exchange of gunfire. By itself, this evidence was sufficient to support the initial aggressor instruction. Thus, the trial court did not err in giving that instruction.

In contrast, the parties agree, and so do we, that the mutual combat portion of the instruction was not supported by substantial evidence. As the court explained in *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*), " 'mutual combat' means not merely a reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities." (*Id*. at p. 1045, italics omitted.) "In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be

13

mutual." (*Ibid.*, fn. omitted.)  Here, no reasonable juror could conclude that defendant and the law enforcement officers had a preexisting agreement or intent to exchange gunfire before the shooting began.  Thus, it was an error for the trial court to give that portion of the instruction.

The parties disagree about the appropriate standard for assessing whether this error was prejudicial.  Relying on *Ross, supra*, 155 Cal.App.4th 1033, defendant argues that the trial court's decision to instruct on mutual combat, without defining that term, means the jury could have rejected his claim of self-defense simply because the parties got into a gunfight.  Thus, he contends the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24, [17 L.Ed. 2d 705, 711]) applies.  The People argue that the mutual combat instruction was only a technical error, subject to harmless error review under the standard in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  We agree with the People, for three reasons.

First, unlike *Ross, supra*, 155 Cal.App.4th at page 1057, there is nothing in this record to suggest the jury's verdict was based on a mistaken understanding of mutual combat.  In *Ross*, the jury asked the trial court to define "mutual combat" and the court not only failed to provide a definition, but mistakenly advised the jury that none could be given.  (*Id.* at pp. 1042-1043.)  *Ross* held that the trial court was obligated to define the term precisely because the jury had exhibited confusion as to its meaning.  (*Id*. at p. 1047.)  No similar showing of jury confusion exists here.

Second, even in *Ross*, the appellate court applied the *Watson* standard.  (*Ross, supra*, 155 Cal.App.4th at pp. 1054-1055.)  The court expressly rejected the contention that the court's failure to define "mutual combat" effectively removed a theory of defense from the jury's consideration.  (*Ibid*.)

Third, " '[t]he meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that

14

the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' [Citation.]" (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 [possibility of confusion may be diminished by the parties' closing arguments], overruled in part on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Here, the jury was told that the limitation on self-defense applies *either* when a person engages in mutual combat *or* "starts a fight."[7] Yet the prosecution never argued that defendant was engaged in mutual combat or that mutual combat prevented defendant from claiming self-defense; the prosecution argued only that defendant was the initial aggressor who started the fight. Defense counsel likewise never mentioned the phrase mutual combat in her closing argument.

For these reasons, we are not persuaded there is a reasonable likelihood that the jury applied the mutual combat instruction in a manner that violated defendant's constitutional rights.[8] (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.) Accordingly, *Watson* is the correct test.

Under *Watson*, reversal is required only if it is reasonably probable a more favorable result would have been reached absent the error. (*Watson, supra*, 46 Cal.2d at p. 836.) The *Watson* test " ' "focuses not on what a reasonably jury could do, but what

---

[7] Jurors also were instructed under CALCRIM No. 200 that some of the instructions given to them might not apply, depending on the facts, and that they should not assume the inclusion of a particular instruction suggests anything about the facts. We presume the jury followed this instruction. (*People v. Fiore, supra*, 227 Cal.App.4th at p. 1378.)

[8] That the jury asked for a legal definition of imminent danger, asked whether shooting a gun at the ground is considered deadly force, and asked for multiple readbacks of defendant's testimony further support the conclusion that the jury did not dismiss the right of self-defense based on an erroneous application of the "mutual combat" instruction.

15

such a jury is likely to have done in the absence of the error under consideration." ' "
(*People v. Clark* (2021) 62 Cal.App.5th 939, 968, italics omitted.)

Defendant has not carried his burden to show that it is reasonably probable he would have obtained a more favorable outcome had the claimed instructional error not occurred. As discussed, the prosecution did not rely on a mutual combat theory, instead arguing that defendant was subject to the limitations of CALCRIM No. 3471 as the initial aggressor. And there is nothing in the record to suggest the jury was confused or sidetracked by the mutual combat portion of the instruction. We therefore do not find it reasonably probable that a different outcome would have resulted in the absence of the mutual combat instruction. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381-1382.) Having found no prejudicial error, we conclude that the trial court's actions did not affect defendant's substantial rights.

D.    *CALCRIM Nos. 571 & 3472*

Defendant next contends that the trial court prejudicially erred by instructing the jury with CALCRIM No. 571, the standard instruction on imperfect self-defense, and CALCRIM No. 3472, the standard instruction on contrived self-defense. Defendant contends that the instructions were incomplete or misleading under the facts of this case because they " 'made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence.' " Defendant claims the erroneous instructions, coupled with the prosecution's arguments, effectively foreclosed his right of self-defense.

Because there is no evidence that defendant objected to the instructions or requested appropriate clarifying or amplifying language, we conclude defendant has forfeited any claim that the instructions should have been modified. (*People v. Lee, supra*, 51 Cal.4th at p. 638.) Nevertheless, we shall address the merits because the claimed error arguably affects his substantial rights and because he raises an ineffective

16

assistance claim based on counsel's failure to object. (*People v. Campbell, supra*, 51 Cal.App.5th at p. 498; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 74.)

We conclude the trial court did not err by instructing the jury with CALCRIM No. 3472. As explained in *People v. Eulian* (2016) 247 Cal.App.4th 1324, "CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Id.* at p. 1334.)

Here, neither party argued (nor presented evidence) that defendant provoked a fight or quarrel as a pretext to use *nondeadly* force. Under the defense's theory of the case, defendant did not intend to provoke anything; he simply tried to scare off the intruders he thought were there to rob him. When the intruders instead started shooting at him, defendant shot back in self-defense. Conversely, the prosecution's theory was that defendant acted with the intent to kill, intentionally provoking a deadly gunfight to prevent the (perceived) theft of the marijuana plants. Thus, this was not the "rare case" in which a modification to the standard instruction was required.

Defendant's reliance on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) is misplaced. In *Ramirez*, there was evidence that the defendants had intended to provoke only a non-deadly fistfight with a rival gang until one of the defendants saw a rival gang member raise an object that looked like a gun, escalating the fistfight to a deadly conflict. (*Id*. at pp. 944-945.) Further, the prosecutor in *Ramirez* repeatedly misrepresented the law to the jury by arguing, based on CALCRIM No. 3472, that the defendants forfeited any right of self-defense if they contrived to use *any* force, even nondeadly force. (*Ramirez, supra,* at pp. 949-950.)

Unlike in *Ramirez*, there was no evidence here that defendant intended to provoke only a non-deadly fight or quarrel. Further, the prosecutor did not argue that CALCRIM No. 3472 "obliterated all forms of self-defense . . . if the defendant contrived to use any force." (*Ramirez, supra*, 233 Cal.App.4th at p. 950.) To the contrary, consistent with the

17

trial court's instruction under CALCRIM No. 3471, the prosecutor told the jury that if the defendant started a fight with nondeadly force, and the victim suddenly escalated the fight by using deadly force, the defendant had the right to use deadly force in self-defense. Accordingly, *Ramirez* has no application to the facts in this case.

We likewise reject defendant's challenge to the instruction (under CALCRIM No. 571) that the doctrine of imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force. Defendant contends the trial court should have clarified that this instruction only applies where a victim's use of force is legally justified and that the imperfect self-defense doctrine is available when the victim's use of force against the defendant is unlawful, even if the defendant set in motion the chain of events that led the victim to attack.

We disagree that such clarification was necessary. By informing the jury that imperfect self-defense is not available if the defendant's wrongful conduct created circumstances under which the adversary's use of force was justified, the instruction adequately conveyed that the defense *is available* if the defendant, without acting wrongfully, set in motion a chain of events under which the adversary's use of force was not justified. Considered in the context of the overall charge, and the parties' arguments, a reasonable juror would understand that a justified use of force means a "legally" justified (i.e., lawful) use of force. Thus, a reasonable juror would have understood CALCRIM No. 571 precludes the application of imperfect self-defense *only if* the defendant committed wrongful conduct that legally justified the adversary's use of force, and that the defense remains available if the adversary's use of force against the defendant was unlawful. The trial court's instruction was an accurate statement of the law. (*People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 273; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) As such,

there is no reasonable likelihood that the jury applied the challenged instructions in an impermissible manner.

Defendant has failed to show the trial court prejudicially erred when it instructed the jury on self-defense under CALCRIM Nos. 571 and 3472. Thus, we reject his claim that his substantial rights were affected and his related claim that his counsel was ineffective in failing to object. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

II

*Sentencing Error*

At the May 13, 2022 sentencing hearing, the trial court imposed on count 3 a sentence of one year (one-third of the middle term) and ordered it to run concurrent to counts 1 and 2. In an amended minute order dated May 17, 2022, the trial court, on its own motion, amended the sentence for count 3 to reflect a one-third of the midterm sentence to be served *consecutive* to count 2, noting that the original sentence on count 3 was an "incorrect sentence."

We invited the parties to submit supplemental briefs on whether the trial court erred by (1) imposing a one-third of the midterm concurrent sentence and then (2) amending that sentence to a consecutive term on its own motion.

The parties agree, and so do we, that the trial court erred by originally imposing the one-third of the midterm concurrent sentence on count 3. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1156, fn. 3 ["Because concurrent terms are not part of the principal and subordinate term computation under section 1170.1, subdivision (a), they are imposed at the full base term, not according to the one-third middle term formula, . . . ."]; *People v. Relkin* (2016) 6 Cal.App.5th 1188, 1197.) The parties also agree, as do we, that the trial court erred by subsequently resentencing the defendant to a consecutive term on its own motion without defendant or his counsel being present. (*People v. Karaman* (1992) 4 Cal.4th 335, 344; *People v. Cutting* (2019) 42 Cal.App.5th 344, 347-349; §§ 977, 1172.1.)

19

The parties disagree, however, as to the proper remedy for these errors. Defendant argues that because the trial court originally imposed a concurrent term, and the law does not preclude a concurrent sentence, we should remand this matter with directions to reinstate the concurrent term and otherwise correct the sentence to reflect a lawful term of confinement. The People argue that because the original sentence was unauthorized, we should remand for a full resentencing. Because the record does not clearly reflect the trial court's intent, we agree with the People that a full resentencing is appropriate.

## DISPOSITION

Defendant's sentence is vacated and this matter is remanded for resentencing in a manner consistent with this opinion.  After resentencing, the trial court is directed to prepare an amended abstract of judgment to reflect the corrected sentence and send a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Robie, Acting P. J.

_____\s\_____,
Wiseman, J.*

---

*       Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.